UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ALEX PERRY,                                      Case No.   2:18-cv-222

      Plaintiff,                              Hon. Gordon J. Quist
                                                 U.S. District Judge

    v.

DANIEL LESATZ, et al.,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This is a civil rights action brought by state prisoner Alex Perry pursuant to
42 U.S.C. § 1983.   Perry, an inmate currently confined at the Baraga Maximum
Correctional Facility (AMF), sued several employees of the Michigan Department of
Corrections (MDOC).

Perry named six Defendants in this lawsuit.   They are: Warden Lesatz;
Resident Unit Manager (RUM) Neimi; Nurses Rajala and Johnson; Dr. Oh; and
Correctional Officer (CO) Sholden.   However, Perry's claims against Defendants
LeSatz, Neimi, and Sholden were dismissed by the Court on January 23, 2019, as
were Perry's equal protection claims against the remaining Defendants. (ECF Nos. 4
and 5.)

Perry's Eighth Amendment claims against Defendants Rajala, Johnson, and
Oh remain in this case.   His claims relates to medical treatment Perry received after
he broke a finger playing basketball.

Presently before the Court are the motions for summary judgment filed by Defendants Rajala, Johnson, and Oh (ECF Nos. 28 and 44) pursuant to Fed. R. Civ. P. 56.   Perry has filed responses (ECF Nos. 42 and 49) to the motions, Defendants have replied to the responses (ECF Nos. 47 and 51), and Perry has filed a sur-reply (ECF No. 52).

The Court has reviewed the materials filed by the parties that includes the medical records.   Perry says that he received improper medical treatment for his broken finger and is permanently damaged as a result of Defendants' conduct.   The medical record establishes that Perry received treatment by each of the Defendants, other prison medical staff, and an outside specialist.   Although Perry may potentially state a negligence or malpractice claim, the record before the Court establishes that each Defendant examined his finger and provided necessary treatment based upon their examination.

Although, the Court is not unsympathetic to Perry, the record fails to establish the existence of a genuine issue of material fact that each of the Defendants acted with deliberate indifference to his serious medical needs.

## II.   Factual Allegations

The District Court summarized Perry's allegations in its January 23, 2019 opinion.   That summary is repeated below:

> Plaintiff alleges that, on December 15, 2017, at 11:00 a.m., while he was playing basketball, he suffered a fracture to the middle finger of his dominant hand.   Plaintiff returned to his unit and spoke to Correctional Officer Kuchie (not a Defendant), explaining what had happened and describing the seriousness of his pain.   Kuchie was impatient and irritated and told Plaintiff to write a medical kite.   Over

the remainder of the first shift, Plaintiff continued to inform unspecified staff about his serious pain and inability to move his finger, but no one took action.

When the second shift arrived, Plaintiff pressed his emergency medical call light.   At 3:30 p.m., Defendant Sholden stopped at Plaintiff's cell during his cell inspection.   By this time, Plaintiff's finger had swollen and was puffed up.   Plaintiff explained his injury and asked Sholden for medical attention.   Sholden responded, "Okay," and walked away.  (Compl., ECF No. 1, PageID.4.)   Plaintiff later asked Sholden a second time, and Sholden responded that the nurse would see Plaintiff during her rounds.

Two and one-half hours later, Plaintiff called out to Defendant Nurse Johnson as she walked past his cell.   Plaintiff explained his injury and told her that he was in agonizing pain and needed pain medication and medical attention.   Johnson responded that it was Friday and nothing could be done.   When Plaintiff asked, "[W]hat if it's broken?," Defendant Johnson repeated that there was still nothing that could be done.  (*Id.*, PageID.5.)   She then walked away.   As she was leaving, Plaintiff asked if he could at least have some medication to relieve the pain and swelling.   Defendant Johnson replied, "We'll see." (*Id.*)

The following day, Plaintiff spoke to Nurse Finnigan (not a Defendant).   Plaintiff showed Finnigan his finger and explained what Defendant Johnson had told him.   Finnigan told Plaintiff that Defendant Johnson was new and did not know what to do.   Finnigan sent Plaintiff to an onsite medical care facility at about 7:00 p.m. There, Defendant Rajala provided Plaintiff with ibuprofen, an ice pack, and a finger splint.   However, Defendant Rajala did not provide tape to hold the splint in place.   Instead, Defendant Rajala gave Plaintiff two band-aids to hold it on.   Defendant Rajala explained to Plaintiff that he needed to remove the splint when he showered.

One week later, on December 21, 2017, Plaintiff's finger was x-rayed.   The result showed a complete fracture at the beginning of Plaintiff's middle finger.   Plaintiff alleges that the splint was inadequate to stabilize the break.   In addition, Plaintiff contends that he was not provided medication strong enough to alleviate pain, causing him to suffer unnecessarily and to lose multiple nights of sleep. Plaintiff filed a grievance about his lack of treatment on December 22, 2017.

On January 31, 2018, a second x-ray was taken of Plaintiff's finger. Thereafter, Defendant Oh advised Plaintiff that he would need to be sent off-site to a hand specialist. Defendant Oh advised Plaintiff to remove his splint every so often, to check his range of motion, and to exercise.

On February 7, 2018, Plaintiff wrote a kite to Warden LeSatz, in which he described his pain and pleaded for medical attention and pain medication. On February 21, 2018, Plaintiff spoke with Defendant Neimi, and Neimi promised to come to Plaintiff's housing unit later to ask Plaintiff about his medical needs. Defendant Neimi did not follow through on his promise. Over the course of two months, Plaintiff sent over a dozen kites and letters to both Defendants Warden LeSatz and RUM Neimi. Plaintiff alleges that both Defendants were made fully aware of Plaintiff's complaints and failed to take action.

Three months after his injury, on March 2, 2018, Plaintiff was finally seen by a hand surgeon, Dr. Blotter, at an off-site facility. Dr. Blotter advised Plaintiff that the facility had made a bad decision to wait three months to send Plaintiff to a specialist. In addition, Dr. Blotter told Plaintiff that the Defendants' advice to remove the splint for showers and for testing range of motion was improper. Dr. Blotter informed Plaintiff that the failure to completely immobilize the finger had led to permanent damage and that Plaintiff may develop a condition called "Mallet finger," which is an injury to the ligament that will permanently prevent the finger from straightening at the terminal joint. In addition, Dr. Blotter advised that it was too late for any corrective surgery, but indicated that, if Plaintiff continued to suffer pain, a bone fusion of the joint could be performed.

(ECF No. 4, PageID.29-31.)    Perry contends that Defendants Rajala, Johnson, and Oh violated his rights under the Eighth Amendment.    Perry seeks compensatory and punitive damages.

## III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of*

*Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV.  Analysis of Perry's Eighth Amendment Deliberate Indifference Claim

### A. Legal Standards

Perry claims that Defendants denied him appropriate care for his broken finger.  The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.   *Id.*   In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.   *Id.*   "[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."   *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).   The Court of Appeals elaborated on the holding in Napier in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. Napier applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).   Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:   A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person."

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).   Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.*   Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.   The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018).   The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.   Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."   This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."   A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.   A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailer, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals."   That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id*. at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.   *Estelle*, 429 U.S. at 105.   As the Supreme Court explained:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.   Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.   Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.   In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id*. at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).

This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.   *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at \*2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."   *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."   *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

## B.   Defendants' Treatment of Perry

Defendants have attached copies of Perry's medical records for the pertinent time period to their motions for summary judgment[1] (ECF No. 28-2 and ECF No. 44-4).  The record shows that on December 15, 2017, Defendant Johnson spoke with Perry "cellside" in the housing unit.  Defendant Johnson stated that Perry was complaining of finger pain, but that no abnormalities were noted.  Perry was instructed to kite health care if he continued to have a problem.  (ECF No. 28-2, PageID.166.)   The Clinical Progress Note is shown below.[2]

### Clinical Progress Note

**Comments:**
Spoke with inmate cellside in housing unit, he complained of a finger problem. No abnormalities noted , instructed to submit health care kite if he continues to have a problem.

**Date:** 01/11/2018
**Time:** 3:37 PM
**User:** Shannon N. Johnson, RN

**Provider: Kristine  Nyquist NP**

**Document generated by: Shannon N. Johnson, RN**

(*Id.*)

The next day, December 16, 2017, Perry was seen by Defendant Rajala at 6:14 p.m.  (*Id.* at PageID.167-169.)   Perry told Defendant Rajala that he jammed his finger and that, when he pulled on it, he heard it pop.  Defendant Rajala observed

---

[1]    AMF Health Information Manager Lisa Rosseau certified that Perry's medical records were regularly compiled and maintained in the course of the operation of the Michigan Department of Corrections.   (ECF No. 44-4, PageID.608.)   A review of the medical records offered in support of each motion for summary judgment shows that they are duplicative.   Therefore, the Court will cite to the medical records offered by Defendant Oh as Exhibit B to her motion for summary judgment (ECF No. 28-8).

[2]    The date / time shown at the top of this note is "12/15/2017 6:26 PM."   (ECF No. 28-8, PageID.166.)   Presumably

that Perry's left middle finger was swollen at the first knuckle.   Defendant Rajala placed a finger splint on and scheduled Perry to see the Medical Provider.   (*Id*.)

On December 19, 2017, Perry was seen by Dr. Bonefeld, who ordered an x-ray and advised Perry to keep the splint on.   (*Id*. at PageID.170.)   Perry's finger was x-rayed on December 21, 2019, and he was subsequently seen by Nurse Practitioner Jo Ann Samuelson.   (*Id*. at PageID.172-176.)   The x-ray showed a fracture of Perry's distal phalanx (fingertip bone).   (*Id*. at PageID.173, 178.)   Perry was wearing a splint that restricted movement of the DIP joint, which is the joint between the middle and distal phalanx of the finger.   Perry was instructed to continue wearing the splint for six weeks.   (*Id*. at 173-174.)

On December 28, 2017, Perry's finger and splint were assessed by Defendant Rajala, and Perry was instructed to notify health care as needed.   (*Id*. at PageID.177.)

On January 4, 2018, RN Dawn M. Coon saw Perry at his cell and noted that the splint was intact.   She instructed Perry to kite as needed.   (*Id*. at PageID.179.)

On January 10, 2018, RN David A. Finegan brought eight strips of tape to Perry in a small biohazard bag, for use with the splint that had been ordered by Nurse Practitioner Samuelson.   (*Id*. at PageID.180-181.)

On January 18, 2018, RN Trudy A. Duquette saw Perry, who stated: "It's getting better, I can touch it now and there is not as much pain now."   (*Id*. at PageID.183.)   Duquette had Perry remove the splint for assessment.   She noted that Perry's finger was tender, continued to exhibit bruising and swelling, and that

Perry had pain with movement.   However, she also noted that the sensation in Perry's finger was intact, motion was within the normal range, and that it was warm to the touch.   (*Id.*)   Pursuant to a special accommodation for a finger brace/splint, Duquette gave Perry ten band-aids to use with the splint to immobilize his injured finger.   (*Id.* at PageID.184-188.)

Perry's left hand was x-rayed again on January 25, 2018.   (*Id.* at PageID.190.) The x-ray again showed an oblique fracture involving the base of the distal phalanx, but the fracture lines appeared less well defined.   However, there continued to be a posterior displacement of the proximal fracture fragment and the fracture extended into the DIP joint.   No significant callus formation was identified.   (*Id.* at PageID.192.)   Later that day, Perry was seen by Defendant Rajala, who noted that the splint was intact and changed the tape securing the splint.   Defendant Rajala also noted that Perry's finger was slightly swollen.   (*Id.* at PageID.191.)

On February 1, 2018, Defendant Oh saw Perry, who complained that he could not bend his distal phalanx at all.   For Perry's plan of treatment, Defendant Oh noted that a surgical consult was being requested to address the fracture of Perry's finger, and that Perry was to continue using his finger splint.   (*Id.* at PageID.193-196.)   The request was reviewed by Dr. Keith Papendick on February 5, 2018.   (*Id.* at PageID.199.)   On February 6, 2018, Defendant Oh reviewed Perry's chart and ordered Ibuprofen 400 mg twice a day to address Perry's discomfort.   (*Id.* at PageID.201-202.)   On February 9, 2018, an appointment was scheduled for Perry to have an orthopedic consult.   (*Id.* at PageID.204.)

On February 28, 2018, Perry kited health care complaining of pain and a continued inability to use his finger.  (*Id.* at PageID.205.)   RN Vicki E. Usitalo responded to Perry by stating that he was scheduled for an orthopedic consult on March 2, 2018.   (*Id.* at PageID.206.)

On March 2, 2018, Perry was seen by Dr. Robert H. Blotter, who diagnosed Perry with left long finger bony mallet.   Dr. Blotter noted that Perry had some subluxation of the joint.   Dr. Blotter stated that Perry had further disruption of the fracture and the remaining distal phalanx, but did not have any retraction of that extensor tendon.   (*Id.* at PageID.207.)   Dr. Blotter stated that the treatment plan was as follows:

> Certainly, three months ago, consideration would probably have been made to pinning that piece or extension splint.   He is using extension splint.   He has taken it off a fair amount as instructed and I think that may have affected some of his subluxation as end result.   I told him at this point though, I would not go in and revise it.   I would let him advance use of that finger as tolerated.   I would discontinue the splint. If after two to three months he is still having a lot of pain and this is bothering him, I think our options would probably be a fusion of that joint.

(*Id.* at PageID.207-208.)

On March 2, 2018, RN Usitalo saw Perry and told him to do range of motion exercises as instructed by Dr. Blotter.   (*Id.* at PageID.211.)

On March 6, 2018, Perry was seen by Defendant Oh, who stated:

> Patient states that he just saw an orthopedic surgeon for his fractured finger on 3/2/18.   He was seen by Joann Samuelson and was recommended to wear splint for 6 weeks on December 21, 2017. Patient came to see me on Feb. 1, 2018, and an ortho consultation was submitted.   He was seen and evaluated by Dr Blotter at MGH on 3/2/18.

It seems during the healing period (12/15/17-2/1/18) he had not followed wearing the splint for a fair amount of time.

(*Id.* at PageID.212.)   Defendant Oh noted that Perry's left middle finger was moderately swollen and very tender, worse than when she had seen Perry five weeks prior.   (*Id.*)   Perry was instructed to massage the affected area several times a day and to use the finger as tolerated, with a plan to recheck Perry in one month.   (*Id.* at PageID.213.)

Perry kited health care on March 29, 2018, requesting pain medication for his finger pain.   (*Id.* at PageID.214.)   On April 2, 2018, Defendant Rajala gave Perry Ibuprofen and reviewed instructions from the Medical Provider.   Perry appeared reassured.   (*Id.* at PageID.215-216.)   Perry later kited health care, stating that he did not know how to perform the finger exercises.   An April 5, 2018, kite response from RN Duquette stated that a handout on finger exercises would accompany the kite response.   Duquette further stated that if Perry did not understand the handout, he should resubmit a kite to that effect, so that an appointment could be made for him to provide education regarding finger exercises.   (*Id.* at PageID.217.)

On April 6, 2018, Perry was seen by Defendant Oh.   Perry told Defendant Oh that following his injury, he had taken his splint off every time he showered because a nurse told him that it was ok to do so.   Defendant Oh noted that on December 19, 2017, Dr. Bonefeld had instructed Perry not to move his finger and to keep the splint on until his x-ray had been reviewed.   Defendant Oh also noted that on December 21, 2018, RN Samuelson instructed Perry to wear the splint for 6 weeks and to follow up with health care.   Defendant Oh observed that Perry's DIP joint was still swollen

and tender.    (*Id.* at PageID.218.)    Under the Assessment/Plan section of the

provider note, Defendant Oh states:

> Plan comments: Instructed how to exercise the injured finger.   If not
> improved further in a month, he will be referred to Orthopedic.    Patient
> states that he was not instructed by the orthopedic doctor how to
> exercise his finger to increase motion (Orthopedic surgeon recommended
> 2-3 month follow up).    Patient should have followed the instructions
> given by Dr. Bonef[eld] and Samuelson during the first 6-8 week periods
> (healing).    Patient also states that due to pain, he has not used the left
> hand much (Per patient).

(*Id.* at PageID.219.)    Perry was provided with education and was reassured.   (*Id.*)

On May 4, 2018, Duquette responded to a kite from Perry by informing him

that he would be reevaluated in one month.    (*Id.* at PageID.222.)

On May 9, 2018, Defendant Oh saw Perry for a follow-up.    Perry continued to

complain that his joint was swollen and painful.    Perry stated that he had been doing

his finger exercises, but that when he bends or touches his finger, it hurts.    Perry

takes Ibuprofen for pain.    Defendant Oh told Perry that surgery may not restore the

DIP joint fully.   (*Id.* at PageID.223-224.)    A request for surgery was submitted.

(*Id.* at PageID.224, PageID.226-234.)

Perry was seen by Dr. Blotter for a surgical consult on June 12, 2018.   Dr.

Blotter stated that Perry had traumatic arthritis of the left long finger DIP joint.

Dr. Blotter talked to Perry about his treatment options, including the risks associated

with surgery.    Perry expressed a desire for surgical repair of the finger and Dr.

Blotter stated that it would be scheduled.    (*Id.* at PageID.237.)    Defendant Oh

conducted a preoperative history and physical on Perry pursuant to Dr. Blotter's

request.   (*Id.* at PageID.240-242.)

Perry had surgery on his finger on July 2, 2018.  (*Id.* at PageID.244-250.)
Upon Perry's return to the prison, he was seen by RN Usitalo, who noted that Perry
was awake and asking for food.  Perry stated that he could not feel his arm, and
Usitalo reassured him that this was normal following a nerve block.  Perry was given
Tylenol #3 for pain and was provided a left arm sling.  (*Id.* at PageID.253-255.)  On
July 3, 2018, Perry was seen by Defendant Oh and complained that the Tylenol #3
and Ibuprofen were not completely controlling his pain.  Defendant Oh submitted a
request for approval of a post-op follow-up visit by the orthopedic surgeon and for
Norco.  (*Id.* at PageID.256-257.)  The request for Norco was deferred by Dr. Rickey
J. Coleman, and Perry was to continue with Tylenol #3.  (*Id.* at PageID.262.)  On
July 5, 2018, Perry was caught giving Tylenol #3 to another inmate during a tray
pass.  (*Id.* at PageID.268.)

On July 13, 2018, RN Corrigan collected Perry's sling because he no longer
needed it and had not been using it.  (*Id.* at PageID.269.)  On July 16, 2018, Perry
had a follow up appointment with Orthopedic Nurse Practitioner Erik Korpi, who
noted that Perry was doing well.  Perry's splint was discontinued along with his
sutures.  Perry's fingers had some generalized swelling, his incision was clean, dry
and intact, and he had normal sensation at the tip of the long finger.  Perry was
instructed to work on range of motion, but was not to do any lifting.  Perry was to
follow up with Dr. Blotter in the next three to four weeks.  (*Id.* at PageID.271.)  RN
Usitalo saw Perry upon his return to the prison and noted that Perry's sutures had
been removed and his splint was off.  Perry expressed understanding of his

instructions to work on range of motion, to keep the wound clean and dry, and not to soak the finger or do any lifting.   (*Id.* at PageID.273.)

On July 18, 2018, Perry stopped RN Usitalo and told her that he still had sutures in his finger that had been overlooked during his appointment.   RN Sundberg saw Perry on July 19, 2018, and found one small suture, which she removed.   (*Id.* at PageID.275-277.)   On July 20, 2018, Defendant Oh saw Perry for a scheduled visit, during which Perry complained of persistent swelling, numbness, and difficulty bending the affected finger joint.   Perry also complained of numbness and stiffness in his fourth and fifth fingers since the splint had been removed two weeks ago.   Defendant Oh observed slight swelling in Perry's left middle finger, but no redness or drainage.   Perry was unable to bend his DIP, but the PIP was not swollen.   Perry was instructed to work on his range of motion, to avoid lifting, and to keep the wound clean and dry.   (*Id.* at PageID.278-279.)

Defendant Oh referred Perry for a follow-up visit with the orthopedic specialist, which was scheduled for August 10, 2018.   (*Id.* at PageID.280-285.)   Dr. Blotter saw Perry on August 10, 2018, and stated that Perry's condition was what he would expect for a patient five weeks post Arthrodesis.   Perry was told he could use his hand as tolerated and was instructed to work on his range of motion.   Dr. Blotter indicated that he thought Perry's range of motion would return in time.   Dr. Blotter planned to see Perry again in two to three months and to get another x-ray at that time.   (*Id.* at PageID.285.)

On September 27, Defendant Oh saw Perry for a scheduled appointment and noted that his middle finger showed no swelling or tenderness, and moved well except for the DIP joint.   Perry was otherwise healthy.   Defendant Oh submitted a request for Perry to be seen by the orthopedic surgeon for a second follow-up visit.   Perry was told to continue working on his range of motion.   (*Id.* at PageID.296-302.)   Dr. Blotter saw Perry on October 16, 2018, and stated that Perry's surgical incision looked good and that Perry had no pain on palpation.   Dr. Blotter noted that Perry was very happy with is result, and that his pain had been resolved.   "Plain x-rays, x-rays of his left long finger show screws in good position.   He has consolidation of fusion across the dorsal aspect of the joint."   (*Id.* at PageID.305.)   Dr. Blotter concluded that Perry had successful arthrodesis of the left long finger DIP joint, and that he could perform all activities, with no restrictions.   (*Id.*)

### C.   Analysis

It is clear from the medical record that Defendants Rajala and Oh provided Perry with treatment on numerous occasions.   Perry claims that Defendant Rajala improperly advised him to remove his splint while showering, which prevented his finger from healing properly.   However, in her affidavit, Defendant Rajala attests that she never instructed Perry to remove the splint while showering, but instead told Perry to change the bandage in the event it became wet while showering.   (ECF No. 44-7, PageID.745.)

Nor does the record support Perry's assertion that he was unaware of the need to keep his splint on while his finger healed.   On April 6, 2018, Perry told Defendant

Oh that following his injury, he had taken his splint off every time he showered because a nurse told him that it was ok to do so.    However, Defendant Oh noted that on December 19, 2017, Dr. Bonefeld had instructed Perry not to move his finger and to keep the splint on until his x-ray had been reviewed, and that on December 21, 2018, RN Samuelson instructed Perry to wear the splint for 6 weeks and to follow up with health care.   (ECF No. 28-2, PageID.218.)

Finally, Perry's allegations regarding Defendant Rajala constitute, at most, negligence on the part of Defendant Rajala.    Deliberate indifference "entails something more than mere negligence." *Farmer,* 511 U.S. at 835.   "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.   On December 16, 2017, Defendant Rajala placed a finger splint on Perry's injured finger and scheduled him to see the Medical Provider.   Perry was seen by Defendant Rajala at 6:14 p.m.   (*Id.* at PageID.167-169.)   Defendant Rajala saw Perry again on December 28, 2017, assessed his finger and splint, and instructed Perry to kite health care as needed.   (*Id.* at PageID.177.)   On January 25, 2018, Defendant Rajala examined Perry's finger and changed the tape securing the splint. (*Id.* at PageID.191.)   On April 2, 2018, Defendant Rajala gave Perry Ibuprofen for pain and reviewed instructions from the Medical Provider.   (*Id.* at PageID.215-216.) It is clear from the record that Defendant Rajala provided Perry with appropriate medical care on multiple occasions.   Even if Defendant Rajala mistakenly told Perry to take his splint off while showering, such conduct does not show that Defendant

Rajala was deliberately indifferent to his medical needs.    Therefore, it is the opinion of the undersigned that Defendant Rajala is entitled to summary judgment.

Perry broadly asserts that Defendant Oh was deliberately indifferent to his medical condition.    Perry states that after his January 31, 2018, x-ray, Defendant Oh told him to remove his splint periodically to check his range of motion.    The record does not support Perry's assertions.    The first time that Perry was seen after January 31, 2018, was on February 1, 2018.    During that appointment, Defendant Oh noted that a surgical consult was being requested to address the fracture of Perry's finger, and that Perry was to continue using his finger splint.    (*Id.* at PageID.193-196.)    As noted above, there is nothing in Perry's medical record indicating that Perry was instructed to remove his brace and exercise his finger prior to Dr. Blotter's instructions to do so when Perry saw him on March 2, 2018.

Perry also claims that Defendant Oh did not give him strong enough pain medication.    On February 6, 2018, Defendant Oh ordered Ibuprofen 400 mg twice a day to address Perry's discomfort.    (*Id.* at PageID.201-202.)    Perry continued to take Ibuprofen as needed for pain up until the date of his surgery.    Perry had surgery on his finger on July 2, 2018.    (*Id.* at PageID.244-250.)    Following his return to the prison, Perry was given Tylenol #3 for pain and was provided a left arm sling.    (*Id.* at PageID.253-255.)    On July 3, 2018, Perry complained that the Tylenol #3 and Ibuprofen were not completely controlling his pain, so Defendant Oh submitted a request for Norco, which was deferred by Dr. Rickey J. Coleman.    Dr. Coleman stated that Perry was to continue with Tylenol #3.    (*Id.* at PageID.256-262.)    On

July 5, 2018, Perry was caught giving Tylenol #3 to another inmate during a tray pass.  (*Id.* at PageID.268.)    The medical record shows that, contrary to Perry's assertion, Defendant Oh was responsive to Perry's complaints of pain and sought to prescribe appropriate medication.  It is respectfully recommended that the Court conclude that there is no genuine issue of material fact showing that Defendant Oh was deliberately indifferent to Perry's medical needs.

Perry claims that Defendant Johnson was deliberately indifferent to his medical needs on the night of his accident.    The medical record indicates that Defendant Johnson saw Perry cell side in the housing unit for complaints of a finger problem, but that no abnormalities were noted.    Defendant Johnson charted that she told Perry to kite health care if he had continued problems.    (ECF No. 28-2, PageID.166.)    Perry alleges that when he asked to see a doctor, Defendant Johnson told him that it was Friday and nothing could be done.

Perry filed a grievance on Defendant Johnson.    In the step I grievance response, RN Nicole A. Sundberg states:

> The nurse was interviewed and she indicated that she was not called by
> housing unit staff regarding the prisoner's injured finger.    Review of
> the housing unit log and the health service urgent/emergent log reveals
> no calls were placed or received.    The nurse indicated that on 12-15-17
> while passing medication in the housing unit the prisoner stopped her
> and complained about his finger.    She instructed the prisoner to submit
> a health care request as she visualized no abnormalities.

(*Id.* at PageID.596.)    In the step II response, RN Patricia Lamb states that the nurse who saw grievant on December 15, 2017, determined that his symptoms did not warrant urgent evaluation at that time, "a matter that has already been referred for

administrative review at the facility level." (*Id.* at PageID.594.)    Finally, RN R.

Harbaugh denied Perry's step III grievance, stating that Defendant Johnson

determined that further treatment was not required at the time of her assessment on

December 15, 2017.   (*Id.* at PageID.592.)

> In Perry's deposition, he stated:
>
> Then Nurse Johnson opened the slot to my door and had me stick my
> hand out the door.  When I stuck my hand out the door she looked at
> my finger and she tried to touch it.   And when she tried to touch it I
> pulled the hand back real fast, I said you can't touch it, it cannot be
> touched, it hurt really bad, I can't even touch it.

(ECF No. 44-2, PageID.580.)    Perry also stated that Defendant Johnson initially had

a hold of his wrist and rotated his hand so she could look at it.    When Perry pulled

his hand away from Defendant Johnson, it remained outside the slot, so she could

still see it.    (*Id.* at PageID.581.)

Perry admits that he pulled his hand away from Defendant Johnson when she

tried to examine it because he did not want anyone to touch his painful finger.    The

medical record shows that Defendant Johnson did not observe symptoms which

indicated a need for immediate treatment.    To establish that Defendant Johnson

acted with deliberate indifference, Perry must show that she acted "with a mental

state 'equivalent to criminal recklessness.'  This showing requires proof that [she]

'subjectively perceived facts from which to infer substantial risk to the prisoner, that

[she] did in fact draw the inference, and that [she] disregarded that risk.'"  *Rhinehart*

*v. Scott*, 894 F.3d at 738 (citations omitted).    In the opinion of the undersigned, Perry

has not made this showing.

## V.  Recommendation

It is respectfully recommended that the Court grant Defendants' motions for summary judgment. (ECF Nos. 28 and 44.)

If the Court accepts this recommendation, this case will be dismissed.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:    March 17, 2020

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U.S. MAGISTRATE JUDGE